Dear Governor Henry Bellmon,
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following question:
May the State of Oklahoma compact with Indian tribalgovernments to allow Indian tribes to conduct pari-mutuelwagering on horse-racing at other than racetrack locations?
 COMPACTS BETWEEN THE STATE AND INDIAN TRIBAL GOVERNMENTS State Compacting Mechanism
¶ 1 Initial inquiry into this topic begins with the powers and limitations of the State to enter into compacts with Indian tribes. With the passage of 74 O.S. 1221 (1989), the Oklahoma Legislature provided the Governor, on behalf of the State, certain additional authority to contract with Indian tribes by providing:
 The Governor [of the State of Oklahoma], or his named designee, is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian Tribal Governments within this state to address issues of mutual interest.
¶ 2 Additional inquiry must be made as to whether the State of Oklahoma may enter into a cooperative agreement or compact with Indian tribes regarding any activities associated with pari-mutuel wagering on horse races. 74 O.S. 1221(B) contains broad language evidencing an intent for cooperation when the Legislature stated that the State of Oklahoma shall work in a spirit of cooperation with federally recognized Indian Tribes in furtherance of federal policy for the benefit of both the State of Oklahoma and Tribal Governments. Our Oklahoma Supreme Court in 1988 restated in the case of Humphrey v. Denney, 757 P.2d 833
(Okla. 1988), the long standing principle that the goal of statutory construction is to follow legislative intent. While the plain language of the statute reflects apparent legislative intent that the Governor have broad powers to enter into cooperative agreements with federally recognized Indian tribal governments within this state on matters of mutual interest, it must be determined whether the definition of "compact" is included within the term "cooperative agreements."
¶ 3 Title 74 O.S. 1221 does not define the term "compact," or "cooperative agreement." Therefore, we will use the common word definition of those words and assume that was the definition used by the Legislature when they adopted the statute. Hess v. ExciseBd. of McCurtain County, 698 P.2d 930, 932 (Okla. 1985).Webster's New International Dictionary, Third Edition, (1981), at page 461 defines the term "compact" as an agreement between parties, or a covenant or contract. Therefore, we conclude that for purposes of this opinion, a compact may come within the definition of cooperative agreements discussed in 74 O.S. 1221
(1989).
¶ 4 The regulation of pari-mutuel wagering on horse races could be considered an issue of mutual interest since one purpose of such a compact would be to insure that the health, safety and welfare of the persons attending such a horse race is protected. It would appear that a compact on the subject of pari-mutuel wagering on horse races would come within the term "cooperative agreement" as contemplated by the statute. Thus, a plain reading of the statute leads one to the conclusion that the Governor possesses the power to enter into compacts with certain Indian tribal governments about issues of mutual interest, such as pari-mutuel wagering on horse races, if other prerequisites are met. (Whether a particular tribe is a federally recognized Indian tribal government within this state to which this statute applies would be a question of fact that is not addressed by this opinion.)
 Tribal Compacting Mechanism
¶ 5 The tribe's authority to negotiate or enter into compacts or agreements with the State on the topic of gaming is expressly set out in the Indian Gaming Regulation Act, codified at25 U.S.C.A. 2701 et seq., specifically at 2710. Subsections (A) and (B) of section 2710 (d)(3) provide that an Indian tribe may negotiate to enter into a Tribal-State compact governing gaming activities occurring on the Indian lands of the Indian tribe, and set out the procedure to obtain approval for such an agreement.
¶ 6 Congress set out a procedure whereby the Indian tribe desiring to conduct certain gaming activities on Indian land would request the State in which such lands were located, to enter into negotiations for the purposes of entering into a Tribal-State Compact governing these activities.
 SCOPE OF STATE-TRIBAL COMPACTS UNDER THE INDIAN GAMING REGULATION ACT
¶ 7 To fully answer your question requires an analysis of the scope of gaming activities which are proper subjects of compacts under the Indian Gaming Regulation Act. In 1988, when Congress passed the Indian Gaming Regulation Act, granting the authority for state-tribal compacts for concurrent jurisdiction over various forms of gaming activities occurring on Indian lands, it divided gaming activities into three classes. Understanding the differences between these classes is essential to the question you present. The three classes of gaming activities as defined at25 U.S.C.A. 2703 are set forth hereinafter.
 Three classes of Gaming Under the Indian Gaming Regulation Act
¶ 8 Title 25 U.S.C.A. 2703 provides as follows:
(6) Class I Gaming
 The term "class I gaming" means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations.
(7)(A) Class II Gaming
The term "class II gaming" means:
 (i) the gaming of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)
 (I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
 (II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
 (III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards, including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and
(ii) card games that
 (I) are explicitly authorized by the laws of the state, or
 (II) are not explicitly prohibited by the laws of the State and are played at any location in the State, but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games.[1]
(8) Class III Gaming
 The term "class III gaming" means all forms of gaming that are not class I gaming or class II gaming.
¶ 9 The Indian Gaming Regulation Act's definitions make it clear that wagering on horse races does not come within the definition of either Class I or Class II gaming.
 Wagering on Horse Racing Is a Class III Gaming Activity
¶ 10 After review of these statutes it is abundantly clear that since parimutuel wagering on horse racing is not included as a Class I or Class II activity, it would therefore be defined as a Class III gaming activity.
 SCOPE OF COMPACTING LIMITED TO CLASS III GAMING ACTIVITIES
¶ 11 Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes. 25 U.S.C.A. 2710 (a)(1). Class II gaming, though not within the exclusive jurisdiction of the Indian tribes, is not a proper subject of tribal-state compacts.25 U.S.C.A. 2710 (b). Only Class III gaming is the proper subject of tribal-state compacts. 25 U.S.C.A. 2710 (d). But not all class III gaming is the proper subject of tribal-state compacts.
 FEDERALLY MANDATED PREREQUISITES FOR CLASS III GAMING ACTIVITIES UNDER A TRIBAL-STATE COMPACT Select General Prerequisites
¶ 12 In order to compact with the State under the Indian Gaming Regulation Act, a tribe must be an Indian tribe recognized as eligible by the Secretary of the Interior. See, 25 U.S.C.A. 2710
and 2703 (5). Additionally, the desired gaming activity must be conducted on Indian land, as defined in the Act. See,25 U.S.C.A. 2710 (d) (1) and 2703 (4).[2]
 Select Specific Prerequisites
¶ 13 Congress has established specific prerequisites that must be met before Class III activities may legally occur on Indian lands. Two of these prerequisites deal with the existence of tribal and state laws permitting the desired activity. In addition to other prerequisites, for Class III gaming activities to be legally conducted on Indian lands, the activities must be:
(A) authorized by an ordinance or resolution that
 (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
 (ii) meets the requirements of subsection (b) of this section, and
(iii) is approved by the Chairman,
 (B) located in a State that permits such gaming for any purpose by any person, organization, or entity.
25 U.S.C.A. 2710 (d) (Emphasis added).
¶ 14 Although the conditions of all applicable federally mandated prerequisites must be met in order for Class III Indian gaming to take place, our analysis today focuses upon the prerequisite set forth in subsection (B) that the Class III gaming be "located in a State that permits such gaming."
 OKLAHOMA LAW DOES NOT PERMIT PARI-MUTUEL WAGERING AT OTHER THAN RACETRACK LOCATIONS
¶ 15 Under the federally mandated prerequisite discussed immediately above, Class III gaming activities may only be conducted on Indian land if the State in which the land is located permits such gaming activity for any purpose by any person, organization, or entity.
¶ 16 A review of Oklahoma law demonstrates that Oklahoma does not permit pari-mutuel wagering other than on racetrack premises during race meetings.
¶ 17 The Oklahoma Horse Racing Act authorizes pari-mutuel wagering at racetracks, on races being conducted at that track.3A O.S. 205.6 (1989). Subsection (A) of that section states:
 Any organization licensee conducting a race meeting may provide places on the race meeting grounds at which it may conduct and supervise the pari-mutuel system of wagering on the horse races conducted by the organization licensee at the race meeting. No other place or method of betting, pool making, wagering, or gambling shall be used or permitted by the organization licensee. The pari-mutuel system of wagering shall be permitted only on horse races conducted at a racetrack where such pari-mutuel system of wagering is authorized pursuant to the provisions of the Oklahoma Horse Racing Act.
¶ 18 The Oklahoma Horse Racing Act also allows the Horse Racing Commission to authorize a racetrack to accept wagers on selected out-of-state feature races, but only if the wagering is conducted at the racetrack, during one of its race meetings. 3A O.S.205.7 (1989). Nowhere does Oklahoma law permit pari-mutuel wagering other than at a horse racing track, during one of the track's race meetings.
¶ 19 In summary, Oklahoma law does not permit pari-mutuel wagering at other than racetrack locations. Accordingly, pari-mutuel wagering at other than racetrack locations is not a proper subject of an Oklahoma tribal-state compact, because to be a proper subject of a tribal-state compact, the federal law mandates that the desired gaming activity be permitted in the state. Not being permitted, no compact can authorize it.
¶ 20 It is, therefore, the official opinion of the AttorneyGeneral that:
 1. Under the provisions of the Indian Gaming Regulation Act,25 U.S.C.A. 2701 et seq., in order for a Class III gamingactivity to be a proper subject of a tribal-state compact, thegaming activity, by virtue of a federally mandated prerequisite,must be on Indian land located "in a state that permits suchgaming for any purpose by any person, organization, or entity."
 2. The pari-mutuel system of wagering in Oklahoma is permittedonly on horse races conducted at a racetrack where suchpari-mutuel system of wagering is authorized pursuant to theprovisions of the Oklahoma Horse Racing Act. See generally, 3AO.S. 201 (1989) et seq.
 3. Pari-mutuel wagering at other than racetrack locations isnot permitted in Oklahoma. Therefore, pari-mutuel wagering atother than racetrack locations is not a proper subject of anOklahoma tribal-state compact, because to be a proper subject ofa tribal-state compact, federal law mandates that the desiredgaming activity be permitted in the state. 25 U.S.C.A. 2710(d)(1).
ROBERT H. HENRY ATTORNEY GENERAL OF OKLAHOMA
GLEN D. HAMMONDS ASSISTANT ATTORNEY GENERAL
[1] The Act goes on to specifically state that Class II gaming does not include baccarat, chemin de fer, or blackjack or electronic facsimiles of certain other games of chance, including slot machines of any kind. 25 U.S.C. § 2703 (7)(B). The Act, in details not pertinent to this opinion, further specifically defines Class II gaming. 25 U.S.C. § 2703 (7)(C) and (D).
[2] The state's duty to negotiate in good faith is not triggered unless the tribe making the request is recognized by the Secretary, and the activity for which a compact is desired is to be conducted on Indian land, as defined in the Act.25 U.S.C. § 2710 (d)(3)(A). Such gaming may be conducted only if a tribal-state compact providing for the same has been entered into and approved by the Secretary. 25 U.S.C. § 2710 (d)(1)(C).